Freeman, J.,
delivered the opinion of the court:
This bill is filed to recover $5,000, amount of an insurance policy on a floating bathing establishment, or boat, which is alleged to have been lost in the Mississippi river, opposite the city of Memphis, where it was and had been located for some time before the contract, and where it was when the disaster occurred. It is alleged, in substance, that the loss occurred on 30th of April, 1868, by sinking of the boat, the result of a rise in the river, floating large logs and snags against the boat. ' It is also charged that complainant, through her agents, used due diligence and exertions to save the boat, without avail,, and notified the .agent of defendants in Memphis, as soon as practicable, of the collision. The answer of defendants admits the issuance of the policy, but denies their liability on several grounds, and says the loss was not wholly by sinking, or from the causes stated, and that due diligence was- not used by complainant to save the boat from loss. They then specify particularly their grounds of defense: -First. Thar the boat was falsely and fraudulently represented to be worth $9,500, at the date of the policy, when, in fact, worth only $3,000. Second. That complainant, instead of taking proper steps after the leak was discovered to save the boat, wholly neglected to use any exertion whatever, but, on the contrary, forbade and prevented men whose duty it v>as to pump out the boat doing-so-, although the watchman, in charge proposed to do so. Third. That the agents of the owner, naming them, had their attention called to the fact that the boat was leaking, by other employes, and that pumping was necessary to- save it, but to all such communications replied that the complainant did not care if the boat did sink,- so that she got her insurance. Fourth. That no effort was made by complainant, to save the boat, and no means used to keep her from sink *187 ing, until after seven clays from discovery of leak, when it was believed sbe was past the hope of .recovery; that it was at this time' the agent of the defendants was for the first time notified, and some inefficient efforts made by complainant with the pretended view of saving the boat. Fifth. That on the day following on which the boat was reported to be in a sinking condition, to wit, October 1st, defendants procured a wrecking-boat to lie alongside the sinking boat, and after examination, the captain of this boat offered to save the boat for $1,800; and the agent of defendants requested complainant’s agent to employ this boat, Salvor No. 1, to save the sinking boat, and that he would ratify the contract that might be made, and pay the expenses thus- incurred; but that the agent of the complainant refused to employ the wrecker to save the boat, or any other means to that end, and declared she was sunk, and they abandoned her. They aver that the boat could have been saved at this time by proper exertions, and said fact was well known to the owner. They then aver that the abandonment of the boat was not in good faith, but was fraudulent, and, in connection with the other acts referred to, part of a design fraudulently to let the boat sink through inattentioli and want of care. In a word, it is alleged that the boat was sunk, or permitted to sink, in pursuance of a fraudulent purpose and scheme to' allow her to be lost in order to realize the insurance money. It is seen from the above summary of the defense that it is placed mainly on the ground of a fraudulent scheme on the part of complainant to permit the boat to be destroyed in order to realize the insurance money on this policy, and thus, as is charged, realize a most advantageous sale, as the boat is represented not to have been worth the amount of the policy by several thousand dollar's.
We find, on examination, that the first allegation of the answer, as to the value of the boat, is not supported by the *188 evidence; on the. contrary, the proof sustains substantially the valuation of complainant.
As to tire second defense — want of proper exertions to save the boat, and forbidding parties, employes whose duty it was to do so, from using the pumps to relieve the boat of water, after the leak was discovered — take the charge as a whole, it is totally unsupported. If we separate this charge, and take the first clause of it, even — that is, that after the leak was discovered, "wholly neglected to use any exertion whatever” to save the boat — this would not be true, as the proof shows that immediately on discovery of the danger, though before day, the agents of complainant put the pumps diligently to work, and did all they could in this direction to relieve the boat of water. Their efforts proved unsuccessful, it is true, but evidently not because they were not honestly made, but from the inadequacy of the means at the command of the parties using them at the time. This is shown by the fact that early in the morning the efforts of a tugboat, with superior means, stimulated by the prospect of $500 reward for success, failed entirely, and the contract was abandoned. So, also, fails all the charges in the answer of purpose and scheme to have the boat sunk, or to aid by neglect in producing this result.
The fifth ground of defense, in connection, probably, with the general denial of the use of due diligence to save the boat, presents the only real question for decision in the case. That allegation is, substantially, that on the day following the sinking of the boat, to wit, on 1st of October, defendant procured a wrecking-boat to lie alongside the vessel, and the captain, after examination, proposed to save the boat for $1,800; that defendants requested complainant’s agents to make this contract, and that he would ratify the contract that might be made, and pay the expenses thus incurred. This offer is charged to have been refused by the agents, and thereupon they abandoned the *189 boat to tbe insurer. Tbis abandonment is alleged not to bave been made in good faith, but fraudulently, and in pursuance of tbe design charged, in order to realize wrongfully tbe insurance money. As we bave said in reference to tbe other charges of fraudulent purpose, there is no evidence on which tbis feature of tbe defense can be sustained. Tbe complainant, a widow lady, at tbe time was confined to her room, having, within a few weeks before given birth to a child; and we see no evidence of bad faith on the part of Appel, her step-father, to justify the liberal charges of fraudulent design with which the answer is filled. But to the question of want of proper efforts in this matter to save the boat: The rule in such cases is that where the loss is not total or absolute, but only a disabling or stranding of the vessel, it is the duty of the assured to act with the same energy and use such means to save the vessel as a prudent man would do, under the circumstances, if not insured — that is, he is honestly to use all such means as are at his command, under the circumstances, to save the property, and, if he fails tO' do this, he cannot abandon and throw the entire loss on the assured. See Copelin v. Insurance Co., 46 Mo., 211, citing The Sarah Ann, 2 Sum., 215.
A total loss, within the policy, may be by the destruction of the vessel, or by such damage as. renders it of little or no value. It is a constructive total loss if Ihe thing insured, though existing in fact, is lost for any beneficial purpose to the owner. 3 Kent, Comm., 319. The proof shows in this case that, after the efforts of the agents of the owners had failed of success in relieving the boat, Crook, the agent of the company, in pursuance of a clause in the contract, employed a tugboat to raise the boat, then submerged, which worked at it until 12 o’clock that day; perhaps later. That clause provides for such an effort on the part of the complainant, and guards the company from the inference that might otherwise be drawn from *190 it, that tlie company bad accepted, tbe abandonment of the property, by providing that snch efforts shall not be considered a waiver or an acceptance of the property. The defendant, then, by its agent, was in charge up to> this time of the boat, under this clause of its contract, and was rightfully using the best efforts at its command to save the boat. The complainant might, we think, well stand by during this time, and wait for the result. In fact, in the nature of things, it must be held that, while the agent was then engaged, such was the duty of the assured, as interference in such a 'case might have thwarted the action of the agent; at any rate, such would have been the natural tendency of any effort on the part of the assured in this case. It was necessary to employ boats for the purpose, with machinery adapted to serve such ends. Another and different boat employed to do the samé work wnuld almost inevitably have produced conflict of efforts, and probably have defeated of itself the attempt of the boats employed by the agent. Each, stimulated by the hope of high prices offered in such cases, prompted by the dangerous emergency and probable destruction of valuable property, would naturally claim to do the work, and thus between them it would likely fail to be done by either. Eor these reasons we think no duty was imposed on complainant during these efforts by the agent. At any rate, as we have said, the assured might well wait until they were ended before any active duty was imposed for whch she might be responsible. The proof then shows that Crook, the agent of the company, soon after the failure of the tug employed to raise the vessel, made another contract for raising the vessel, but this y/as abandoned. He then, probably on the next day, called on the captain of a wrecker known as “Salvor No. 1,” and proposed to make a contract with him to raise the boat. This was agreed to at the sum of either $1,500 or $1,800. Crook then took the clerk of the boat, and, in connection with his own *191 counsel, bad an interview with the counsel of complainant, and urged that complainant should go into this contract, which was refused. The counsel of complainant insisted I hat the boat was sunk, and a loss had occurred, and that they had the right to abandon, and tendered a formal abandonment to the agent.
We now examine the question whether a state of case existed justifying an abandonment; for we think it to be the sounder rule that, if the case is one in which the assured had the right to abandon as for a total loss, then the offer itself, above referred to, cannot be relied on to defeat an indisputable right. Phil. Ins., 292, and authorities cited.' This being so,- it follows that if such a state of things existed at the time of the abandonment as justified it, then the company is liable, regardless of subsequent events or developments occurring after the notice of abandonment to the insurer, or his agent. The proof, we think, shows that the vessel was at this time sunk up to her hurricane roof at the stern, and was only a little elevated at the bow, so as to, prevent the submersion being total; that she was fastened to- a post on the bank by chains and cable so as to prevent her drifting off, and thereby a total wreck was prevented. In this state of case the vessel was for the time rendered useless to the owner for the purposes to which she had been devoted. It is true, she was not on a voyage, so that, in the language of the cases, the voyage might be said to be lost; but still she was stranded so as to prevent her use for the purposes of a bathing boat, in which use she was then insured. Prima facie, a case of loss had occurred. It then devolved on the insurers to show that, in fact, at the time of the abandonment, she was not a total constructive loss, so as to justify the assured in the abandonment to the-company. This is attempted by the insurer, by proof showing what would have been the cost of raising and restoring the vessel by repairs to her original condition. The rule is settled in the United States, *192 by a large preponderance of authority, that if the cost of raising the vessel and repair, as she appears at the time, will be less than half her value, then the right of abandonment does not exist, with the additional qualification, in perhaps all cases, that this can be done within such a reasonable time as will enable the ship to complete her voyage and make it beneficial to her owners. It is true, as said by Chancellor Kent (3 Comm., top p. 321), the right of abandonment docs not depend upon the certainty, but upon the high probability of a total loss, either of the property or the voyage, or both. The insured is not to act on certainties, but upon probabalities; and if the facts present a case of extreme hazard, and of probable expense, exceeding half the value of the ship, the insured may abandon, though it should happen that she was afterwards recovered at less expense.
"Within these principles, we are compelled to hold that complainant was not justified, on the proof, in abandoning the boat to the insurer. The testimony shows that in the opinion of the experts — men of large exeprience and competent knowledge on the subject — the boat might have been raised in twenty-four hours, and this was offered to be done by the captain of the wrecker Salvor No. 1. It is shown, too, very clearly, in the opinion of like witnesses, that the boat could have been, in a short time, repaired at an expense of probably not more than $300. This is the highest estimate of the whole cost of raising and repairing. This being so, under the rule it was the duty of the assured to have made the effort to raise' and repair. If it had failed, o.r if, when raised, the repairs as then shown would have made the cost more than or equal to one-half her value, it would have been proper to have exercised the right of abandonment, but not before. We therefore hold the chancellor erred in degreeing for the full amount as for a total constructive loss under the assumed abandonment, and so much of his decree is reversed. But from *193 tbe allegations of fact and tbe proof, while tbe complainant fails to show a right to a recovery as for a total loss on this ground, it is equally clear that she is entitled to recover as for a partial loss, and this will be the cost of raising tbe vessel, $1,800, and tbe estimated cost of repairs, at $300, with interest from that date. It is argued that tbe boat ultimately proved a total loss, except her bull, by breaking loose from her moorings, and drifting down the river. This is all true, but was caused by failure of tbe assured to avail, herself of tbe use of the means of saving tbe boat at band. Tbe wrecker bad moved herself alongside, and passed chains, or hawsers, as they are called, under her, so as to support tbe boat, and was prepared with pumps and all necessary means to raise her. Tbe assured declined to take advantage of these means of saving the boat, and tbe subsequent total loss must be charged to this failure on her part, and not to the insurer. Tbe owner chose to risk her claim on tbe right of abandonment, and, not being justified in this, must take tbe consequences of her decision. A decree will be drawn in accordance with this opinion. /The,costs of this court and of tbe court below will be” divided between complainant and defendants.